UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SILVER CURVE GAMES, INC.,

Plaintiff,

-v.-

ICAHN SCHOOL OF MEDICINE AT
MOUNT SINAI,

Defendant.

25 Civ. 4184 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Silver Curve Games, Inc. ("Silver Curve," or "Plaintiff") sued

Defendant Icahn School of Medicine at Mount Sinai ("Mount Sinai," or

"Defendant") for the alleged misappropriation of trade secrets.  In brief, Silver

Curve claims ownership in a proprietary technology developed by nonparty

Misael Aponte and alleges that Mount Sinai misappropriated that technology in

the process of creating and marketing a health care application.

Silver Curve brings claims under the Defend Trade Secrets Act of 2016

(the "DTSA"), 18 U.S.C. § 1836(b), and New York state law.  Before the Court

now is Mount Sinai's motion to dismiss the case for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below,

the Court grants Defendant's motion to dismiss.  Specifically, the Court

dismisses Plaintiff's federal and state trade secret misappropriation claims

based on the applicable statutes of limitations, and declines to exercise

supplemental jurisdiction over Plaintiff's remaining state-law claims.

**BACKGROUND**[1]

A.    **Factual Background**

1.    **Mr. Aponte's Initial Development of the Proprietary Technology and Its Transfer**

The factual background of this case relates to the alleged development of a healthcare application.  In 2013, Mr. Aponte developed certain "source code and related proprietary data."  (FAC ¶ 6).  Sometime before March 15, 2014, Mr. Aponte's source code "became the property" of a corporation called Mini Yous Inc. ("Mini Yous"), though the FAC does not specify when or how.  (*Id.*).  At the pre-motion conference the Court held in connection with the instant motion, Plaintiff represented to the Court that "Mr. Aponte was the owner of Mini [Yous]."  (Dkt. #14 ("PMC Tr.") at 6:6-6:12).

Mini Yous allegedly used that source code to "develop[ ] a unique multi-tenant medical social platform that enables doctors to maintain distinct professional profiles across different hospitals while ensuring data segregation and security."  (FAC ¶ 7).  The platform's "authentication system used advanced hashing and token persistence to provide seamless yet secure access, with hospital-specific content isolation built into the core architecture."  (*Id.*).

---

[1]    This Opinion draws its facts from the First Amended Complaint ("FAC" (Dkt. #13)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the FAC, each of which is incorporated by reference in the FAC.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).  Those documents include a Mutual Non-Disclosure Agreement ("NDA" (Dkt. #13-1)) and a Memorandum of Understanding ("MOU" (Dkt. #13-2)), both between Mount Sinai and Mini Yous Inc., as well as a page from an online booklet distributed by Mount Sinai discussing technological innovations Mount Sinai had adopted ("Mount Sinai Booklet" (Dkt. #13-3)).

Its "innovative data model allowed doctors to effectively manage their presence across multiple institutions while maintaining strict compliance with healthcare privacy standards." (*Id.*). Plaintiff claims that this platform and its features were Mini Yous's trade secret (the "Proprietary Technology"). (*Id.*).[2] From 2014 through February 2015, Mini Yous allegedly "pursued independently the development of its own business to exploit its trade secret," principally by soliciting investors in that business. (*Id.* ¶ 8).

### 2. Mr. Aponte's Employment at Mount Sinai

On March 15, 2014, Mr. Aponte was hired as a software engineer with Mount Sinai App Lab (alternatively, the "App Lab"), a department of Mount Sinai. (FAC ¶¶ 6, 10). He maintained that employment until May 15, 2015. (*Id.* ¶ 26). At the App Lab, Mr. Aponte's direct supervisor was Dr. Ashish Atreja. (*Id.* ¶ 9). Among the "key projects" on which Mr. Aponte worked was "RxU, the initial concept of which was a healthcare app store for doctor-related applications, which concept evolved into a socially interactive platform for sharing clinical trial results." (*Id.* ¶ 11). Indeed, during Mr. Aponte's tenure at Mount Sinai, he "worked primarily on [this] project." (*Id.* ¶ 12).

According to the FAC, Mr. Aponte "demonstrated the Mini Yous platform to the staff" at the App Lab office during "the late summer of 2014." (FAC ¶ 12). Dr. Atreja allegedly "overheard the ensuing discussion and expressed an interest in using the Mini Yous platform for the RxU project." (*Id.*). Dr. Atreja

---

[2]    The Court notes that during the pre-motion conference, Plaintiff describes the trade secret in an arguably more limited fashion as "the source code, and whatever related proprietary data attaches to that." (PMC Tr. 8:4-8:25).

subsequently contacted others affiliated with Mount Sinai regarding the platform. (*Id.* ¶ 14).

### 3.    The Relevant Agreements

The FAC alleges the existence of three potentially relevant agreements. *First*, it claims that on September 15, 2014, Mount Sinai sent Mr. Aponte a "Co-Development Agreement" that "offered to purchase … the source code and platform … for $5,000." (FAC ¶ 16). Mr. Aponte supposedly "rejected" that offer (*id.*), and there are no further allegations about that agreement.

*Second*, the FAC alleges that Mini Yous and Mount Sinai entered into a mutual nondisclosure agreement (the "NDA") on October 29, 2014. (FAC ¶ 20; *see generally* NDA). As relevant here, Mini Yous agreed in the NDA to "provide certain proprietary information" to Mount Sinai with the understanding that "no transfer of title" would occur. (FAC ¶ 20; *see also* NDA ¶¶ 1, 5). Information exchanged pursuant to the NDA was provided subject to certain protections against its disclosure and certain restrictions on its use. (NDA ¶ 2). However, a party receiving ostensibly confidential information under the NDA had "no obligation" with respect to information that, among other things, (i) "was known to Receiving Party prior to disclosure by Disclosing Party," (ii) "[wa]s lawfully obtained by Receiving Party from a third party under no obligation of confidentiality," or (iii) "bec[ame] generally known or publicly available other than by unauthorized disclosure." (*Id.* ¶ 3).

The NDA recites that "[t]he rights and obligations of the Parties under this Agreement may not be sold, assigned or otherwise transferred." (NDA ¶ 8).

And it contains an automatic termination provision indicating that the agreement would expire on October 17, 2015, "unless terminated on thirty … days written notice by either Party."  (*Id.* at 3).  Upon termination, the party receiving confidential information would maintain its "obligations of confidentiality and restrictions on use of the Confidential Information disclosed" for "five … years."  (*Id.*).  Consequently, any obligations and restrictions under the NDA expired no later than October 17, 2020.[3]

*Third*, the FAC alleges that Mini Yous and Mount Sinai entered into a memorandum of understanding (the "MOU") in March 2015.  (FAC ¶ 22; *see generally* MOU).  The MOU notes that the parties expected to "cooperate in developing software and an application for use in health care."  (MOU § I(B)).  Under the MOU, "Mini Yous w[ould] provide Mount Sinai a list of web services, existing source code with documentation, at least 1 Full-Time … programmer … and other assistance as may be reasonably required," while "Mount Sinai develop[ed] an application for health care, initially for inflammatory bowel disease."  (*Id.*).

In the MOU, "Mini Yous grant[ed] Mount Sinai an unrestricted license to copy and prepare derivative works of Mini Yous software and application code, and use the same in Mount Sinai Health system and consortium partners

---

[3]     Defendant asserts that "any obligations and restrictions under the NDA expired no later than October 17, 2019."  (Def. Br. 7).  Plaintiff counters that the NDA's "obligations … expired on October 28, 2019."  (Pl. Opp. 15).  Both dates appear erroneous.  The Court has seen neither evidence nor allegation that either party terminated the NDA early or that the parties altered the agreement to provide protection for only four years after termination. (*See* NDA 3 (describing that obligations extend five years after termination, which occurs one year after October 17, 2014, absent notice from either party)).

during and after the Project." (MOU § I(D)). The MOU further declares that "Mini Yous will grant Mount Sinai the right of first refusal to develop Health Care applications to be used with Mini Yous software" (*id.* § I(C)(2)), and it allows Mount Sinai to "design applications that utilize Mini Yous software which integrate electronic health records maintained by medical service providers and professionals as an application for medical service providers, patients, or both" (*id.* § I(C)(3)). It also contemplates the "licensing [of] the software to third parties." (*Id.* § I(C)(4)).

Under the MOU, the parties recognized the potential to "co-develop software ... over a period of three ... years," which would "initially comprise of a healthcare forum application developed to facilitate communications between physicians and patients, and additionally between patients themselves." (MOU § I(A)). But despite all the discussion of contemplated cooperation, the MOU specifically indicated that it should not "be construed to form a joint venture, partnership, or employer-employee relationship between the parties" or to "create[ ] or impl[y]" any "fiduciary duties." (*Id.* § VI).

The MOU expressly indicates that it was "non-legally binding" and was meant only "to guide [Mini Yous and Mount Sinai's] evolving relationship with one another and to form the basis of future agreements." (MOU 1; *see also id.* § VIII (noting that, with one exception that is irrelevant here, "[t]he parties underst[oo]d that no binding obligations w[ould] be created under this MOU")). After the MOU was signed on March 27, 2015 (*id.* at 4), Mr. Aponte allegedly

"delivered by hand a USB flash drive containing the Mini Yous source code" to Dr. Atreja (FAC ¶ 24).

Like the NDA, the MOU contains an automatic termination provision, which would be triggered three years after signing on March 27, 2018. (MOU § VI).  At that time, the parties could agree to a subsequent MOU "or enter into a formal business relationship." (*Id.*).  "In the event of a conflict between terms in the NDA and MOU," the MOU specifies that "the NDA [would] control." (*Id.* § V).

### 4.    The Alleged Misappropriation

Plaintiff alleges that the Proprietary Technology "was used as the foundation of the RxU health care application," which Mr. Aponte helped develop while at Mount Sinai.  (FAC ¶¶ 12, 25).  During Mr. Aponte's employment, the App Lab "completed the first version of the RxU project," which allegedly "incorporated the" Mini Yous "source code and platform." (*Id.* ¶ 26).  Plaintiff claims that Mount Sinai realized revenue from the RxU app, and eventually sold the app to Commure Inc. ("Commure") in 2023, "without sharing any … revenue … with Plaintiff." (*Id.* ¶ 27).

The FAC asserts that Plaintiff "had no … knowledge of [Mount Sinai]'s commercial exploitation of [the RxU] app" before the sale to Commure.  (FAC ¶ 28).  At the pre-motion conference, Plaintiff represented that it learned about Mount Sinai's commercialization of the RxU app "through trade publications or … general news." (PMC Tr. 11:15-11:17).  But the FAC also acknowledges that "Defendant prominently displayed and acknowledged the [RxU] app … as

one of its significant commercializations in the category described as Digital Health, as reflected on page 6 of its booklet entitled 'Innovation Partners and You Bringing Mount Sinai Discoveries to Life' (available on its website)." (FAC ¶ 52; *see* Mount Sinai Booklet). The webpage displaying that booklet has been available online since 2019. *See* Innovation Partners and You: Bringing Mount Sinai Discoveries to Life, Mount Sinai, https://ip.mountsinai.org/wp-content/uploads/sites/3/2019/11/Digital-Innovation-Guide.pdf [https://perma.cc/7P9W-Z3SF] (last visited March 5, 2026).[4]

Silver Curve was not involved in the original development of the Proprietary Technology, but it allegedly became "the assignee of the [Mini Yous] Proprietary Technology as a result of [a] transfer made ... by Mini Yous to Plaintiff." (FAC ¶ 29). Silver Curve is alleged to be "a New York corporation and has an office" in Brooklyn, New York. (*Id.* ¶ 3). Other materials in the record indicate that it is incorporated in Delaware but has its headquarters in New York. (Dkt. #6).

---

[4]     "Authority in this Circuit supports that the Court may take judicial notice of the content of webpages, including the content of archived webpages available through the Wayback machine." *Lee* v. *Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 248-49 (S.D.N.Y. 2025) (collecting cases).

The Wayback machine confirms that the Mount Sinai Booklet has been available online since at least November 13, 2019. *See* Innovation Partners and You: Bringing Mount Sinai Discoveries to Life, Mount Sinai (archived from Nov. 13, 2019), https://web.archive.org/web/20200728161444/https://ip.mountsinai.org/wp-content/uploads/sites/3/2019/11/Digital-Innovation-Guide.pdf [https://perma.cc/W7Z8-GD3A] (last visited March 5, 2026).

**B.    Procedural Background**

Plaintiff commenced this action by filing a summons and verified complaint in New York state court on April 23, 2025.  (Dkt. #1-1).  On May 19, 2025, Defendant removed the case to this Court.  (Dkt. #1).  Two days later, Defendant filed a letter seeking a pre-motion conference regarding an anticipated motion to dismiss.  (Dkt. #5).  Plaintiff replied to Defendant's letter on June 4, 2025, in which letter Plaintiff also indicated that it did not object to removal.  (Dkt. #9).

The Court held the pre-motion conference on June 26, 2025.  (June 26, 2025 Minute Entry; Dkt. #14).  At the conference, the Court set both a deadline for Plaintiff to file an amended complaint and a briefing schedule regarding Defendant's motion to dismiss.  (June 26, 2025 Minute Entry).  On July 22, 2025, Plaintiff filed its FAC, the operative pleading in this matter.  (Dkt. #13).

The FAC raises four causes of action: (i) trade secret misappropriation under the DTSA, 18 U.S.C. § 1836(b), (ii) trade secret misappropriation under New York law, (iii) conversion under New York law, and (iv) unjust enrichment under New York law.  (FAC ¶¶ 30-55).  On August 15, 2025, Defendant filed its motion to dismiss the FAC under Rule 12(b)(6) and a memorandum of law in support thereof.  (Dkt. #16-17).  Plaintiff filed its opposition on September 19, 2025.  (Dkt. #18).  On October 3, 2025, Defendant filed its reply, thus concluding briefing on Defendant's motion.  (Dkt. #19).

## DISCUSSION

### A.    Motions to Dismiss for Failure to State a Claim Under Federal Rule of Civil Procedure 12(b)(6)[5]

Under Rule 12(b)(6), a defendant may seek dismissal of part or all of a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to

---

[5]    In its memorandum of law, Defendant at one point argues that "Plaintiff [l]acks [s]tanding," an argument usually made under Federal Rule of Civil Procedure 12(b)(1). (Def. Br. 12-14). But nowhere does Defendant cite Rule 12(b)(1) (*see* Def. Br. 1-3 (referencing only Rule 12(b)(6) in a section discussing the legal standard)), and the Court understands Defendant to be referring to whether Plaintiff can state a viable claim, a concept formerly known as statutory standing. *See Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (discussing concept of statutory standing). Defendant makes two main arguments in its discussion of "[s]tanding," but the Court believes that both are more properly analyzed under Rule 12(b)(6). (*See* Def. Br. 12-14 (discussing whether Silver Curve's claims are duplicative of contract claims and whether Silver Curve sufficiently alleges ownership of trade secrets)). *See Bancorp Servs., LLC* v. *Am. Gen. Life Ins. Co.*, No. 14 Civ. 9687 (VEC), 2016 WL 4916969, at *6, 9-11 (S.D.N.Y. Feb. 11, 2016) (discussing whether a plaintiff's trade secrets claims are duplicative of contract claims and whether the plaintiff has properly alleged a trade secret on a Rule 12(b)(6) motion).

'nudge[ ] [a plaintiff's] claims across the line from conceivable to plausible.'"
(quoting *Twombly*, 550 U.S. at 570)).  Bare recitals of the elements of a cause of
action are not sufficient, and courts need not accept legal conclusions as true.
*Iqbal*, 556 U.S. at 678.

Courts apply *Twombly*'s pleading requirements stringently in cases
involving the DTSA.  In these actions, "[a]lthough there is 'no heightened
pleading requirement,'" *Iacovacci* v. *Brevet Holdings, LLC*, 437 F. Supp. 3d 367,
380 (S.D.N.Y. 2020) (quoting *Tesla Wall Sys., LLC* v. *Related Cos., L.P.*, No. 17
Civ. 5966 (JSR), 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017)), "district
courts in this circuit routinely require that plaintiffs plead their trade secrets
with sufficient specificity to inform the defendants of what they are alleged to
have misappropriated," *Mendidata Sols., Inc.* v. *Veeva Sys. Inc.*, No. 17 Civ. 589
(LGS), 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018); *accord Zabit* v.
*Brandometry, LLC*, 540 F. Supp. 3d 412, 422 (S.D.N.Y. 2021).

## B.    Analysis

### 1.    Plaintiff's Federal and State Trade Secret Misappropriation Claims Are Untimely

Because it is dispositive, the Court begins (and ends) by discussing
Defendant's argument that the relevant statutes of limitations bar Silver
Curve's trade secret misappropriation claims.  (*See* Def. Br. 15-18).  *See*
*Garrasi* v. *Wells Fargo Bank, N.A.*, No. 22-921, 2024 WL 191802, at *1 n.1 (2d
Cir. Jan. 18, 2024) (summary order) (considering the statute of limitations
issue first because "federal courts maintain the inherent flexibility … to choose
among threshold grounds for disposing of a case without reaching the merits"

(internal quotation marks omitted) (quoting *Cavanaugh* v. *Geballe*, 28 F.4th 428, 432 n.4 (2d Cir. 2022))).

Plaintiff argues that the Court cannot decide Defendant's statute of limitations argument on a motion to dismiss (*see* Pl. Opp. 25-26), but that is wrong. When ruling on a Rule 12(b)(6) motion, a court may consider an affirmative defense based on the statute of limitations "if the defense appears on the face of the complaint." *Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425-26 (2d Cir. 2008). Here, it does.

Plaintiff's federal and state misappropriation claims have three-year limitations periods. *See* 18 U.S.C. § 1836(d) ("A civil action … may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation."); *Universal Instruments Corp.* v. *Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019) ("In New York, a cause of action for the misappropriation of trade secrets is governed by a three-year statute of limitations[.]"). Furthermore, "[a]ccrual of the statute of limitations begins when 'a reasonably diligent person in plaintiff's position would have been put on inquiry as to the' claim." *Id.* at 50 (quoting *Stone* v. *Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)); *see also* 18 U.S.C. § 1836(d).

Given this case law, the question here is whether Plaintiff — through its predecessor in interest Mini Yous, *see In re Enron Corp.*, 379 B.R. 425, 435-36

12

(S.D.N.Y. 2007) (noting that the "assignee stands in the shoes of the assignor" (internal quotation marks omitted) (quoting *Goldie* v. *Cox*, 130 F.2d 695, 720 (8th Cir. 1942))) — either (i) knew about the misappropriation or (ii) with reasonable diligence should have known about the misappropriation before April 23, 2022, which is three years before Plaintiff brought this action. *See* 18 U.S.C. § 1836(d); *Universal Instruments Corp.*, 924 F.3d at 50.

As an initial matter, based on the FAC, the alleged misappropriation occurred no later than 2019. Mount Sinai published a booklet on or before November 2019 that discussed RxU as an example of its projects that had gone through "[t]he life-cycle of commercialization," meaning that Mount Sinai had already commercialized the application by that time. (Mount Sinai Booklet). Plaintiff alleges, however, that it had "no ... knowledge of [Mount Sinai]'s commercial exploitation of [the RxU] app" until 2023. (FAC ¶ 28).

According to Plaintiff, that this allegation ends the inquiry (*see* Pl. Opp. 25-26 (assuming the relevant question to be when "Plaintiff ... discovered the alleged misappropriation")),[6] but that too is wrong. Even if Plaintiff had no

---

[6]    The Court notes that the FAC is noticeably evasive in its timeline. Indeed, Plaintiff's main argument for why the statute of limitations does not apply is that "Plaintiff has not specified the date on which it discovered the alleged misappropriation ... , [which] prevents the Court from determining ... the date when the cause of action accrued." (Pl. Opp. 25). As discussed above, Plaintiff is wrong as a matter of law. *See* 18 U.S.C. § 1836(d); *Universal Instruments Corp.* v. *Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 50 (2d Cir. 2019).

Perhaps more disturbingly, however, it appears that Plaintiff deliberately failed to provide a detailed timeline in the FAC to "prevent[ ] the Court from determining ... when the cause of action accrued" (Pl. Opp. 25), a litigation strategy that reeks of bad faith. *See* Fed. R. Civ. P. 1 ("These rules ... should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). In any event, Plaintiff's attempt to stave off dismissal by omitting key dates fails because, as explained above and stated by Defendant, "the

knowledge that Mount Sinai was profiting off the RxU app before 2023, the key question is whether reasonable diligence would have led to the discovery of the alleged misappropriation before that time.  *See* 18 U.S.C. § 1836(d); *Universal Instruments Corp.*, 924 F.3d at 50.

The face of the FAC makes plain that Mini Yous, Plaintiff's predecessor in interest, would have discovered the alleged misappropriation with reasonable diligence no later than October 2020, meaning that Plaintiff had to raise its trade secret misappropriation claims no later than October 2023.  Because Plaintiff did not file this lawsuit until April 23, 2025 (Dkt. #1-1), those claims are untimely.

The factors that should have triggered Mini Yous's discovery of the alleged misappropriation by October 2020 are numerous, and each is clear from the face of the FAC.  *See Staehr*, 547 F.3d at 425-26 (explaining that a court can only rule on the statute of limitations at this stage if the defense appears on the face of plaintiff's pleadings).  Borrowing a phrase from securities cases, there were multiple "storm warnings" that should have "suggest[ed]" to Mini Yous "the probability that" Mount Sinai had misappropriated the Proprietary Technology.  *LC Cap. Partners, LP* v. *Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (internal quotation marks omitted) (quoting *Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir 1993)).

---

key dates are plain from the relevant agreements, Plaintiff's other allegations, and matters of which the Court may take judicial notice."  (Def. Reply 3).

The context is worth describing in detail.  Long before October 2020, Mini Yous knew that its owner, Mr. Aponte, had used the Proprietary Technology to help Mount Sinai develop the first version of the RxU application, which was his main project during his employment at Mount Sinai.  (FAC ¶¶ 11-12, 25-26).  Mini Yous also knew, based on the text of the MOU, that Mount Sinai intended to use, license, and monetize the software and information shared by Mini Yous after the termination of the MOU in March 2018.  (MOU §§ I(C)(3)-(4), I(D), III(C)).  Finally, it knew that the protections that the NDA provided over the Proprietary Technology expired in October 2020. (NDA 3 (describing that the party receiving confidential information maintained its "obligations of confidentiality and restrictions on use of the Confidential Information disclosed" for five years after the termination of the agreement, which occurred on October 17, 2015)).

These factors provided sufficient storm warnings for Mini Yous to be vigilant against the possibility that Mount Sinai would engage in misappropriation of the Proprietary Information.  At a minimum, Mini Yous was on notice that securing continued protection for those trade secrets required some action after October 2020.  *Cf. Structured Cap. Sols., LLC* v. *Commerzbank AG*, 177 F. Supp. 3d 816, 836 (S.D.N.Y. 2016) ("Once a third party's confidentiality obligation (assuming *arguendo* one exists) expires, so does the trade secret protection.").  And yet, Mini Yous did nothing until 2023.

Even more important than the context of the prior relationship between Mini Yous and Mount Sinai was the fact that Defendant, far from hiding its

alleged misappropriation, was actively flaunting it.  The FAC asserts that Mount Sinai "*prominently displayed* and acknowledged the [RxU] app ... as one of its significant commercializations" in a booklet that also appeared on its website.  (FAC ¶ 52 (emphasis added)).  This app had the same name and addressed the same problem as the one that Mr. Aponte had helped develop for Mount Sinai using the Proprietary Technology.  (*Id.* ¶¶ 25-26).  "As such, 'suspicions should have abounded' when [Mount Sinai] ... began marketing a product" that Mini Yous knew incorporated its trade secrets.  *Seatrax, Inc.* v. *Sonbeck Int'l, Inc.*, 200 F.3d 358, 366 (5th Cir. 2000) (alterations adopted) (quoting *Computer Assocs. Int'l, Inc.* v. *Altai, Inc.*, 918 S.W.2d 453, 457 (Tex. 1996)).

To summarize, Mini Yous provided Mount Sinai with direct access to the alleged trade secrets.  Its owner helped Mount Sinai use the trade secrets to develop an early version of a commercial application.  It knew that Mount Sinai intended to use, license, and monetize the trade secrets through the further development of commercialized applications.  And it also knew that certain documents protecting the Proprietary Technology had expired.

The last of these circumstances — the expiration of the NDA protecting the trade secrets — occurred in October 2020.  And by that time, Defendant had begun marketing the very application that Mini Yous's owner had helped Defendant develop with the alleged trade secrets.  Under these circumstances, the Court can reach no other conclusion than that Mini Yous would have discovered the alleged misappropriation had it exercised reasonable diligence.

16

Indeed, the Court is unclear how much more obvious the circumstances could be.

This case is akin to *Universal Instruments Corp.*, 924 F.3d 32. There, a medical device company solicited bids from software developers for a product it intended to develop. *Id.* at 38-39. The project included two phases. *Id.* at 38. Universal Instruments Corp. ("Universal") won the bid to work on phase one, and it provided the medical device company with the requested source code. *Id.* But Universal lost the bid for phase two. *Id.* at 38-39. Phase two required the source code Universal developed for phase one, however, so the medical device company provided to the winning phase two bidder a copy of Universal's source code. *Id.*

Universal sued the medical device company for, among other things, the misappropriation of trade secrets. *Universal Instruments Corp.*, 924 F.3d at 39. The Second Circuit held, however, that Universal's trade secrets claims were untimely because they had begun accruing when (i) Universal knew that the medical device company "wanted to replicate" Universal's software and (ii) the medical device company informed Universal that it had awarded the business for the "replication project" to another software company. *Id.* at 50.

The level of notice is similar in the instant case. Plaintiff knew that Defendant intended to use Plaintiff's trade secret in the development of certain commercial applications. And Plaintiff also knew that Defendant had not continued a business relationship with Plaintiff to effectuate the development of those applications. Therefore, like the Court in *Universal Instruments Corp.*,

the Court here determines that "'a reasonably diligent person in [P]laintiff's position would have been put on inquiry as to the' claim." *Universal Instruments Corp.*, 924 F.3d at 50 (quoting *Stone*, 970 F.2d at 1048).

The Court notes that Plaintiff has nowhere argued that it exercised *any* diligence into Mount Sinai's actions between 2015 and 2023. (*See generally* FAC; Pl. Opp. 25-26 (contesting only whether the Court can assess Defendant's statute-of-limitations argument at this stage, not whether that statute-of-limitations argument is meritorious)).[7] All that Plaintiff offers is the explanation that it did not check to see if Mount Sinai had continued to use the Proprietary Technology because "the expectation was Mount Sinai … supposedly was an institution that would deal in good faith, and if there was a development or a commercial exploitation of [RxU], that it would inform Mr. Aponte of such result." (PMC Tr. 12:10-12:21).

But this explanation makes little sense. If Plaintiff really held those expectations about Mount Sinai, the Court wonders why it would have entered into the NDA or MOU to protect its trade secrets. And Plaintiff certainly could not have had those expectations when the MOU expressly indicated Mount Sinai's desire to use the Proprietary Technology for commercial purposes in the

---

[7]     The Court also notes that, at the pre-motion conference, it expressly raised this concern and gave Plaintiff a chance to amend its complaint with that consideration in mind. (PMC Tr. 19:14-19:19 (the Court stating that it "actually do[es]n't think that there's any indication of diligence here"); *id.* at 32:7-32:18 (scheduling the filing of an amended complaint)). Given that Plaintiff was aware of the Court's concerns about its exercise of diligence, but added no further allegations addressing that topic, the Court can draw no other conclusion than that Plaintiff did not exercise any diligence with respect to Defendant's use of the Proprietary Information.

future.  Indeed, the MOU nowhere hinges such use of the Proprietary
Technology on the provision of notice to Plaintiff.  (*See, e.g.*, MOU §§ I(C)(3)-(4),
I(D), III(C)).

The Court thus holds that Plaintiff's misappropriation claims are
untimely based on the face of the FAC.  *See Sewell* v. *Bernardin*, 795 F.3d 337,
339 (2d Cir. 2015) (noting that dismissal "'is appropriate when a defendant
raises' ... lack of timeliness ... 'as an affirmative defense and it is clear from the
face of the complaint, and matters of which the court may take judicial notice,
that the plaintiff's claims are barred as a matter of law'" (quoting *Staehr*, 547
F.3d at 425)).  And because the statute of limitations bars Plaintiff's trade
secrets claims based on the face of the FAC, leave to amend "would ... be futile"
and is thus denied.  *Cuoco* v. *Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see
also City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173,
188 (2d Cir. 2014) (noting that dismissal is proper if a deficient complaint
cannot be remedied by "additional facts or legal theories").[8]

---

[8]    In addition to its statute of limitations argument, Defendant posits that Plaintiff's
allegations do not establish the elements of a claim for trade secret misappropriation.
(*See* Def. Br. 13-14 (arguing that Plaintiff has not alleged ownership of the trade secrets
at issue); *id.* at 18-20 (arguing that Plaintiff relinquished any trade secret protections by
publicly disclosing the secret); *id.* at 20-21 (arguing that Plaintiff failed to allege that it
tried to protect its trade secrets); *id.* at 21-22 (arguing that Plaintiff failed to allege that
Defendant engaged in any wrongful conduct)).

The Court does not find any of those arguments to be particularly compelling.  It notes
that the closest issue is Defendant's assertion that it did not improperly use Plaintiff's
trade secrets because any trade secret protection expired with the protections of the
NDA.  (Def. Br. 21-22).  *See Structured Cap. Sols., LLC* v. *Commerzbank AG*, 177 F.
Supp. 3d 816, 836 (S.D.N.Y. 2016) ("Once a third party's confidentiality obligation ...
expires, so does the trade secret protection.").  But here, the NDA's protections expired
in 2020, and there is evidence that Mount Sinai commercialized the RxU app using the
Proprietary Technology by 2019.  (*See* FAC ¶ 52).

> **2.    The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's Conversion and Unjust Enrichment Claims**

When Mount Sinai removed this case to federal court, it indicated two grounds for removal. *First*, it argued that this Court has federal question jurisdiction over Plaintiff's DTSA claim under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's remaining claims under 28 U.S.C. § 1367. (Dkt. #1 ¶¶ 5-10). *Second*, it argued that this Court has diversity jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 because complete diversity exists between the parties and the amount in controversy exceeds $75,000. (*Id.* ¶¶ 11-15).

Plaintiff's FAC, however, suggests that the parties are not diverse, inasmuch as both are New York corporations, so the Court has no subject matter jurisdiction under 28 U.S.C. § 1332. (FAC ¶ 3 (Plaintiff asserting that it "was and is" a New York corporation); *see also* Dkt. #6 (explaining what while Plaintiff is incorporated in Delaware, it has its headquarters in New York)). Given that the Court has dismissed Plaintiff's lone federal claim — together with a closely related state claim, *see supra* B.1 — the Court next considers whether to retain jurisdiction over the remaining state-law claims in this case.

---

Defendant also makes an additional argument that Plaintiff's trade secrets claims are duplicative of contract claims and therefore must be dismissed. (Def. Br. 12-13). *See My Mavens, LLC* v. *Grubhub, Inc.*, No. 20 Civ. 4657 (PGG), 2023 WL 5237519, at *24 (S.D.N.Y. Aug. 14, 2023) (collecting cases). But the question here is complicated because the Plaintiff is not a party to the contract it supposedly seeks to enforce, and that contract prohibited the transfer of any party's rights under the contract. (NDA ¶ 8). The Court thus is not willing to hold that this case is like others in which courts have dismissed a plaintiff's trade secret misappropriation claims as "duplicative" of contract claims because Plaintiff has no contract claim here. *My Mavens, LLC*, 2023 WL 5237519, at *24.

28 U.S.C. § 1367(a) provides a district court with "supplemental jurisdiction over all other claims that are so related to claims" within the district court's original jurisdiction "that they form part of the same case or controversy."  But the "district court[ ] may decline to exercise supplemental jurisdiction … if … the district court has dismissed all claims over which it has original jurisdiction."  *Id.* § 1367(c)(3).  Indeed, the Second Circuit has stated that "where the federal claims are dismissed before trial, the state claims should be dismissed as well."  *Delaney* v. *Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Marcus* v. *AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998)); *see also Pitchell* v. *Callan*, 13 F.3d 545, 549 (2d Cir. 1994) ("[I]t is axiomatic that a court should decline to exercise jurisdiction over state-law claims when it dismisses the federal claims prior to trial[.]").  This is because "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 n.7 (1988).

Such is the case here.  Convenience and "judicial economy support[ ] dismissal … because this case is far from trial ready."  *Penske Media Corp.* v. *Shutterstock, Inc.*, No. 20 Civ. 4583 (MKV), 2024 WL 1313356, at *2 (S.D.N.Y. Mar. 27, 2024).  And comity and fairness strongly support dismissal because "[n]eedless decisions of state law should be avoided both as a matter of comity

and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726 (1966).  Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law conversion and unjust enrichment claims.

## CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is GRANTED.  Plaintiff's claims for federal and state trade secretion misappropriation are dismissed with prejudice, while Plaintiff's conversion and unjust enrichment claims are dismissed without prejudice to their refiling in state court.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      March 6, 2026
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge